IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| MICHAEL MURPHY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 03-0864-CV-W-HFS |
| ) | |
| ) | |
| NORTHWEST MUTUAL INSURANCE ) | |
| COMPANY, et al., ) | |
| ) | |
| Defendants. ) | |

**ORDER**

Before the court is the motion of defendant Thomas G. Lipscomb III ("Lipscomb")[1] for summary judgment. (doc. 73). Defendants Northwestern Mutual Life Insurance Company ("Northwestern Insurance")[2] and Northwestern Mutual Investment Services, LLC ("Northwestern

---

[1] Plaintiff states that Lipscomb is a licensed insurance agent in Missouri, and is a resident of Kansas. (Amended Complaint: ¶ 5). He works at the office of defendant Gary L. Hames Agency, and is a licensed insurance agent of defendant Northwestern Mutual Life Insurance Co. and a registered representative of defendant Northwestern Mutual Investment Services LLC. (Id).

[2] In his first amended complaint, plaintiff states that Northwestern Insurance is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin; registered and doing business in Missouri. (Amended Complaint: ¶ 3).

Investment")[3] also move for summary judgment. (doc. 75). Additionally, defendant the Gary Hames Agency ("Hames")[4] moves for summary judgment. (doc. 78).

Also, before the court is the defendants' collective motion to strike certain witnesses from plaintiff's witness list. (doc. 94). Finally, Hames seeks to seal exhibits identified in plaintiff's consolidated statement of facts in opposition to the motions for summary judgment. (doc. 103). Doc. 94 will be treated as a motion in limine and the motion to seal will be denied at this late stage of litigation. SO ORDERED.

## Background Facts

The essential facts are not much in dispute, but where controverted, this will be noted. In September of 1977, plaintiff, Michael Murphy, purchased a Northwestern Mutual Extra Ordinary Life Insurance Policy from Tom McTigue, a college acquaintance.[5] In July of 1987, plaintiff purchased a second life insurance policy from Lipscomb. Both policies were a whole life insurance policy with a death benefit of $54,347, and an annual premium of $577.71. In October of 1993, plaintiff purchased another life insurance policy from Lipscomb; this policy was defined as a Whole

---

[3]Plaintiff states that Northwestern Investment is a broker/dealer licensed by the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD") to sell variable life insurance policies. (Amended Complaint: ¶ 4). However, plaintiff acknowledges that Northwestern Investment was not a licensed broker in the state of Missouri until October 2000, after the sale of the policies involved in this litigation. (Id).

[4]Plaintiff identifies the Hames Agency as an authorized agency of the Northwestern defendants, and the employer of Lipscomb. (Amended Complaint: 6).

[5]According to plaintiff, after McTigue moved away from Kansas City, his account was assigned to Lipscomb. (Plaintiff's Additional Facts: ¶ 21).

Life Paid Up at 90 insurance policy with a death benefit of $25,000, and an annual premium of $538.00.

In October of 1995, Lipscomb contacted plaintiff to discuss retirement planning. At that time, plaintiff was 42 years of age, single with no dependents, and had been a lifelong smoker. According to plaintiff, Lipscomb advised him that he was not financially prepared for retirement, and recommended a retirement plan that would allow plaintiff to acquire "piles of money" which could be withdrawn at age 65, "tax free." This was to be accomplished through the purchase of cash value life insurance policies.

Thus, in October of 1995, plaintiff purchased from Lipscomb a whole life adjustable insurance policy (No. 13 480 030), with an initial death benefit of $145,000 and an additional death benefit of $45,000, and the annual premium was $5,999. (The Northwestern defendants' Ex.: 14).

In December of 1997, plaintiff purchased from Lipscomb a variable whole life insurance policy (No. 14 411 580), with an initial death benefit of $262,890, and the annual premium was $10,300. (The Northwestern defendants' Ex.: 24).

In June of 1999, plaintiff purchased from Lipscomb another variable whole life insurance policy (No. 15 057 740), with an initial death benefit of $586,199, and the annual premium was $30,000. (The Northwestern defendants' Ex.: 32).

Plaintiff claims that the Northwestern defendants and Hames were aware of Lipscomb's allegedly misleading sales practices, i.e. representing the policies as retirement vehicles, with tax advantages, and that in December of 2002, he learned of Lipscomb's allegedly deceptive sales

3

practices, and contacted the National Association of Securities Dealers ("NASD") for legal advice.[6] In May and June of 2003, plaintiff states that he surrendered all of his policies, and learned that NASD was investigating Lipscomb and Northwestern Investment regarding Lipscomb's sales practices concerning cash value life insurance policies. Plaintiff states that although he paid the Northwestern defendants approximately $219,825.02, he received only $160,416.20 after surrendering the policies; resulting in a net loss of $59,408.82.

In an amended complaint, plaintiff asserts claims against all defendants, alleging in Count I - Fraud; Count II - Negligent Misrepresentation; Count III - Breach of Fiduciary Duty; and Count IV - Recission. As against the Northwestern defendants and Hames, plaintiff also asserts claims alleging in Count V - Vicarious Liability; and Count VI - Negligent Supervision.

Standard of Review for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Semanko v. Minnesota Mut. Life Ins. Co., 168 F.Supp.2d 997, 999 (D.Minn. 2000). In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Semanko, at 999; quoting, Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A fact is material only when its resolution affects the outcome of the case.

---

[6]Plaintiff subsequently states in his statement of additional material facts that in November of 2002, the NASD contacted him regarding Lipscomb. (Statement of Additional Material Facts: ¶ 130).

4

Semanko, at 997; citing, Anderson v. Liberty Lobby, Inc., 477 U.S. . A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. Id.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. Semanko, at 1000. However, the nonmoving party may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. Id. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id.

Economic Loss

Defendants claim that plaintiff seeks damages that are the projected retirement revenues the policies would purportedly generate, the total premiums paid by plaintiff, all fees, expenses, costs, and taxes paid over the term of the policies, and the performance of the investments made under the policies. (Plaintiff's Interrogatory Answer No. 17). Defendants argue that plaintiff's claims for fraud, negligent misrepresentation, breach of fiduciary duty, vicarious liability, and negligent supervision are not claims of personal injury or injury to property, and are, therefore, barred under the economic loss doctrine. Semanko, at 1001 n. 1.

The economic loss doctrine prohibits tort recovery for purely economic losses, consigning such claims to contract law. Cunningham v. PFL Life Ins. Co., 42 F.Supp.2d 872, 886 (N.D.Iowa 1999). However, it has been held that claims for fraud are an exception to the economic loss doctrine. Cunningham, at 887. Thus, when a plaintiff's damages are proximately caused by a

5

defendant's intentional, false representation, the plaintiff is not barred from recovering economic damages because of the economic loss doctrine. Id.

While defendants' argument has some merit, they have ignored an exception to this theory. For example, when a person possesses knowledge or skill superior to that of an ordinary person, the law requires of that person conduct consistent with such knowledge or skill. Business Men's Assur. Co. v. Graham, 891 S.W.2d 438, 453 (Mo.App.W.D. 1994). In other words, a professional person owes a client a duty of care commensurate with "the degree of care, skill, and proficiency commonly exercised by ordinarily skillful, careful and prudent professionals." Business Men's, at 453.

Defendants counter that the holding in Business Men's does not apply to insurance agents; however, their argument fails. It has been held that insurance agents are held to a professional standard of care. Jones v. Kennedy, 108 S.W.3d 203, 207 (Mo.App.S.D. 2003). [7] Specifically, an insurance agent who seeks to procure insurance for a party, with a view toward earning a commission, becomes that party's agent. Id. Thus, defendants' motions for summary judgment as to this claim will be denied.

The parties will recognize that I have outlined further views on this subject in a Preliminary Memorandum. Those views also support this result but need not be repeated.

---

[7]It remains to be seen, however, as to whether plaintiff's claims are included within that standard of care. Jones v. Kennedy, 108 S.W.3d at 207, for Missouri does not recognize a duty on the part of an insurance agent to advise customers as to their particular insurance needs or as to the availability of optional coverage.

6

Breach of Fiduciary Duty

In order to adequately plead a claim for breach of fiduciary relationship, a plaintiff must plead: (1) the existence of a fiduciary relationship between the parties; (2) a breach of that fiduciary duty; (3) causation; and (4) harm. Dairy Farmers, 292 F.3d at 568; see also, Koger v. Hartford Life Ins. Co., 28 S.W.3d 405, 411 (Mo.App.W.D. 2000). A fiduciary relationship may arise as a matter of law by virtue of the parties' relationship, e.g., attorney-client, or it may arise as a result of the special circumstances of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the former. Shervin v. Huntleigh Securities Corp., 85 S.W.3d 737, 740-41 (Mo.App.E.D. 2003). The question in determining whether a fiduciary or confidential relationship exists is whether or not trust is reposed with respect to property or business affairs of the other. Shervin, at 741. A confidential relationship exists when one person relies upon and trusts the other with the management of his property and attendance to his business affairs, thereby creating *some degree* of fiduciary obligation. Id.

In his amended complaint, plaintiff alleges that defendants served as financial advisors and that he reasonably placed his trust and confidence in their financial advice concerning his retirement. It is noted, however, that in opposition to defendants' motions, plaintiff fails to submit any evidence tending to show a fiduciary or confidential relationship with either Hames or the Northwestern defendants independently of Lipscomb; thus, the claim for breach of fiduciary duty against these defendants will be dismissed, unless there is vicarious responsibility.

Under Missouri law, no fiduciary duty generally exists between insurer and insured. Dairy Farmers, at 568; see also, Koger, at 411; citing, A.G. Edwards & Sons, Inc. v. Drew, 978 S.W.2d 386, 394 (Mo.App. 1998). Moreover, Missouri does not recognize a duty on the part of an insurance

7

agent to advise customers as to their particular insurance needs or as to the availability of optional coverage. Jones v. Kennedy, 108 S.W.3d at 207; see also, Blevins v. State Farm Fire & Cas. Co., 961 S.W.2d 946, 951 (Mo.App.W.D. 1998).[8]

However, when one party acts as an investment advisor for another party, a fiduciary relationship is likely to be found. Cunningham v. PFL Life Ins. Co., 42 F.Supp.2d 872, 888-889 (N.D.Iowa 1999).[9] In his testimony, plaintiff does not aver that either the Northwestern defendants or Hames represented the policies as retirement vehicles; in fact, plaintiff's testimony is replete only with alleged advice given by Lipscomb.

In opposition to defendants' arguments, plaintiff claims that because Lipscomb held himself out as an expert in securities and financial planning, a fiduciary relationship existed. In support of this contention plaintiff relies on State ex rel. Paine Webber, Inc. v. Voorhees, 891

---

[8] Stated policy reasons for refusing to hold the agent liable included the court's reluctance to remove the burden on the insured to attend to his/her own financial needs and expectations; potential to transform insurance companies from a competitive marketplace to financial counselors or guardians; knowledge of each insured regarding his or her own personal assets and ability to pay that far exceeded that of the agent; a change would subject insurance agents to liability for failing to advise regarding every possible option, including that of competing companies; and insureds could then seek coverage for a loss after it occurred by merely alleging that they would have purchased the necessary coverage if it had been offered. Jones, at 207 n. 2; Blevins, at 951. These reasons relate to the simple acquisition of insurance coverage.

[9] It is noted, however, that the court in Cunningham, for purposes of a motion to dismiss, found that the evidence presented by plaintiffs, under facts somewhat similar to those at bar, could be sufficient to show the existence of a fiduciary relationship between the insurance company and its subsidiaries with plaintiffs. Cunningham, 42 F.Supp.2d at 888-89. Nevertheless, and unlike the circumstances at bar, the plaintiffs in Cunningham, presented evidence that the insurance company and its subsidiaries dressed up their life insurance policies as "college funding programs" and other investment vehicles. Cunningham, at 888. Further evidence was presented in the form of sales scripts showed that the agents were instructed to conceal that they were selling life insurance. Cunningham, at 889. Finally, plaintiffs argued that the alleged improper sales tactics were encouraged and approved by the insurance company and its subsidiaries. Id.

8

S.W.2d 126, 128 (Mo. 1995), which held that in Missouri, stockholders owe customers a fiduciary duty. Paine Webber, at 130; see also, Vogel v. A.G. Edwards & Sons, Inc., 801 S.W.2d 746, 751 (Mo.App. 1990). Plaintiff's argument is persuasive because, here, the question of duty owed to a customer involves that owed by an insurance agent allegedly acting as an investment advisor. Because there is a question of material fact as to the alleged advisory nature of the relationship between plaintiff and Lipscomb, summary judgment will be denied to Lipscomb and will be denied to the co-defendants if they have vicarious responsibility or have conferred apparent authority on Lipscomb.

Fraud and Negligent Misrepresentation

To establish fraud, plaintiff must prove: (1) a false, material misrepresentation; (2) the speaker's knowledge of its falsity or his ignorance of its truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's reasonable reliance on its truth; and (5) the hearer's consequent and proximate caused injury. Kesselring v. St. Louis Group, Inc., 74 S.W.3d 809, 813 (Mo.App.E.D. 2002); see also, Li v. Metropolitan Life Ins. Co., 998 S.W.2d 828, 829 (Mo.App.E.D. 1999).

The elements of a negligent misrepresentation claim are similar. Kesselring, at 813. The plaintiff must prove: (1) the speaker supplied information in the course of his business; (2) because of a failure by the speaker to exercise reasonable care, the information was false; (3) the information was intentionally provided by the speaker for the guidance of a limited group of persons in a particular business transaction: (4) the listener justifiably relied on the information; and (5) due to the listener's reliance on the information, the listener suffered a pecuniary loss. Id.

9

There are, however, two differences between a fraudulent and negligent misrepresentation. Id. First, fraudulent misrepresentation requires that the person *knowingly or recklessly* supply false information, whereas negligent misrepresentation requires no such knowledge or recklessness. Id. Second, negligent misrepresentation requires that the information be supplied in the course of the defendant's business. Id.

The two major alleged misrepresentations made by Lipscomb are: (a) that the life insurance policies were retirement vehicles; and (b) that plaintiff would be able to withdraw money from the policies tax free. Defendants join in their arguments that Lipscomb's representations were not false.[10] Although the policies in question do not expressly indicate usage for retirement purposes, by letter dated March 15, 2001, Lipscomb states that he forwarded information to plaintiff directing the use of life insurance as supplemental retirement income. (Lipscomb Ex.: U). Lipscomb further explains that a portion of each premium paid on the policies funded a death benefit and the remainder of the premium funded a cash accumulation account that could fluctuate in value with the performance of the investments into which the premium was placed. (Suggestions in Support of Summary Judgment: pg. 11). Lipscomb further explains that plaintiff was free to utilize, *inter alia*, loans and annuities to provide retirement funds on a tax free basis. (Id). Conversely, plaintiff argues that Lipscomb, who had extensive experience dealing with insurance products, knew that his representations were false or was reckless as to the truth of the representations.

---

[10]Hames then argues that plaintiff's claims of fraud and negligent misrepresentation are based solely on alleged oral statements and omissions by Lipscomb. (Suggestions in Support of Summary Judgement: pg. 38-40). Inasmuch as he never spoke with or otherwise communicated with plaintiff, Hames contends that he is entitled to summary judgment on these claims. (Id).

10

Nevertheless, the factor upon which the parties are in serious dispute is whether plaintiff justifiably relied on the alleged misrepresentations. Lipscomb claims that, even if false, plaintiff fails to show ignorance.[11] Lipscomb also contends that plaintiff's signature on the policies precludes a claim of unjustifiable reliance. Warren Supply Co. V. Lyle's Plumbing, L.L.C., 74 S.W.3d 816, 819 (Mo.App.W.D. 2002) (one who signs a contract is presumed to have known its contents and accepted its terms). Moreover, Lipscomb claims that voluminous materials describing the policies were provided to plaintiff before, during, and after each of the three sales, and that plaintiff repeatedly admitted during his deposition that he failed to read the material.

Plaintiff counters that, based on his fiduciary relationship with Lipscomb, he had a right to rely on Lipscomb's representations, an issue of which is generally held to be a question of fact. Tietjens v. General Motors Corp., 418 S.W.2d 75, 83 (Mo. 1967). However, under the circumstances at bar, plaintiff's reliance on Tietjens may be limited to matters not clearly apparent in the policies. In Tietjens, the court recognized the general rule that one should not neglect means of information within easy reach after a fraudulent representation, but under the circumstances therein presented, the court held that the rule should have no application where distinct specific representation is made to be acted on or to induce action, and has induced action. Id. In Tietjens, the plaintiff sought to purchase a dealership, but due to false representations by a General Motors zone manager, plaintiff ultimately purchased much more, including the land, building[12], shop equipment, fixtures and farm machinery parts. Tietjens, at

---

[11]Hames simply states that plaintiff presents no direct claim against it, and further, Lipscomb's statements to plaintiff were not false. (Suggestions in Support of Motion: pg. 40).

[12]Among other things, plaintiff claims that the zone manager advised him that if he increased the existing building by at least thirty-five hundred more square feet, the franchise

11

78. In the case at bar, accurate information on the harmful representations alleged was not within easy reach. Similarly, in Thaler v. Niedermeyer, 170 S.W. 378 (Mo.App. 1914), upon which Tietjens relies, the plaintiff relied on fraudulent misrepresentations, and false representations made by sellers of property, and plaintiff's reliance was also based on a note which contained false information.

There are genuine issues of material fact as to whether Lipscomb's were false misrepresentations, and whether plaintiff justifiably relied on the representations. Thus, although summary judgment will be available to Hames and the Northwestern defendants in the event there is no vicarious responsibility or apparent authority, it will be denied as to Lipscomb.

### Vicarious Liability

Plaintiff alleges that the Northwestern defendants and Hames authorized and permitted Lipscomb to use deceptive and fraudulent representations to induce him to purchase the policies, and should be held liable for Lipscomb's alleged wrongful conduct. (Amended Complaint: ¶¶ 48-49). The doctrine of respondeat superior imposes upon an employer vicarious liability for negligent acts or omissions of his employee or agent that are committed within the course and scope of his employment or agency. Bargfrede v. American Income Life Ins. Co., 21 S.W.3d 157, 158 (Mo.App.W.D. 2000). To hold an employer liable under the doctrine of respondeat superior, there must be evidence that a master-servant relationship existed between the parties when the alleged negligent act occurred. Bargfrede, at 158.

---

application would be approved. Tietjens, 418 S.W.2d at 78.

Defendants argue that a claim of vicarious liability requires that there be an underlying wrong, and because plaintiff has failed to demonstrate that Lipscomb is liable for fraud, negligent misrepresentation, and breach of fiduciary duty, they are not vicariously liable. In support of this argument defendants rely on <u>Meckfessel v. Weber</u>, 901 S.W.2d 335, 339 (Mo.App. 1995) for the proposition that the liability of the master can be no greater than the liability of the servant. Although plaintiff fails to address this argument, it is without merit. For, as previously noted there are genuine issues of material fact regarding Lipscomb's liability on the claims alleged against him.

Nevertheless, Hames alternatively argues against the imposition of vicarious liability because Lipscomb was an independent contractor. The general rule provides that an insurance company is liable for the torts of its agents acting within the scope of their employment. <u>Employers Mut. Cas. Co.</u>, 351 F.3d at 896. However, it must first be determined whether Lipscomb was an agent of the Northwestern defendants and/or Hames, or was acting as an independent agent, also known as a broker. <u>Id</u>. The distinction is important because an insurance company is only liable for the torts of its agents, whereas a broker is "independently liable to the insured in either contract or tort for failing to procure insurance as instructed." <u>Id</u>. An independent contractor is one who contracts with another to do something for him but is neither controlled by the other nor subject to the other's control with respect to his physical conduct in the performance of the undertaking. <u>Bargfrede v. American Income Life Ins. Co.</u>, 21 S.W. 3d at 158.[13]

---

[13]Presumably control of speech in sales promotions could be considered a form of "physical control" or, more plausibly, a form of control analogous to the automobile driving at issue in <u>Bargfrede</u>.

Case 4:03-cv-00864-GAF   Document 166   Filed 06/13/05   Page 13 of 19

Hames attempts to support its argument with a copy of the contract executed by Lipscomb and Northwestern Insurance and Hames which states that Lipscomb "shall be an independent contractor and nothing herein shall be construed to make Agent an employee of the Company,..." (Hames: Ex. 22; ¶ 4).[14]

"Generally, the relationship of principal-agent or employer-employee is a question of fact to be determined by the jury when, from the evidence adduced on the question, there may be a fair difference of opinion as to the existence of the relationship." Bargfrede, at 161. "The employment relation is a question of law for the court *only* where the material facts from which it is to be inferred are not in dispute and *only* one reasonable conclusion can be drawn therefrom." Bargfrede, at 161-62.

The list of determinative factors is numerous, and none of the factors alone is conclusive. Some of the elements to be considered include the extent of control the master may exercise over the work; the skill required in the particular occupation; the length of time for which the person is employed; the method of payment; and whether the principal is in the business. Bargfrede, at 162; citing, Restatement (Second) of Agency, § 220(1).[15] Here, there are several facts which require settlement by a jury. First, it is undisputed that Northwestern Insurance and Hames were engaged in the insurance business. Second, although the contract explicitly stated that Lipscomb was not an

---

[14] The contract described the Hames Agency as the General Agent or First Party of Northwestern Insurance, and Lipscomb as the Agent. It was executed by Gary Hames, Lipscomb, and Dennis Tomson as Vice-President of Northwestern Insurance.

[15] I note for the parties' consideration that if Missouri uses the Restatement in Bargfrede it may use the Restatement to limit vicarious responsibility for punitive damages. See § 217 C relied on by the Supreme Court in Kolstad v. American Dental Assn., 527 U.S. 526, 542-3 (1999), where § 904 of the Restatement of Torts was also cited. Limited research indicates this "complicit rule" is used in Iowa and Illinois but has not yet been considered in Missouri.

14

employee, and was free to exercise his own judgment as to persons solicited for insurance needs, the contract permitted Northwestern Insurance the right to "adopt regulations respecting the conduct of the business..." (Hames: Ex. 22; ¶ 4). Third, the contract contained an Exclusive Dealing provision which quite expressly stated that Lipscomb "shall do no business for any other company which issues annuity contracts, or life insurance or disability income insurance policies, ..." (Hames: Ex. 22; ¶ 6). Fourth, Lipscomb's general duties were also restricted so that he could not engage in any business other than that covered by the contract, without the consent of Hames. (Id: ¶ 8). Fifth, either party had a right to terminate the contract with thirty days notice. In <u>Bargfrede</u>, this fact was held to indicate that the insurance agent was an employee rather than an independent contractor. <u>Bargfrede</u>, at 164-65. In sum, overall, these controverted facts are reasonable indicia indicating a genuine issue of fact as to the relationship between Hames, Northwestern Insurance and Lipscomb, and whether there is a triable issue of fact regarding vicarious liability. In further support of denial of summary judgment I refer to the Second Preliminary Memorandum.

Negligent Supervision

"Negligent supervision" is a variant of the common law tort of negligence, and to make a prima facie case, a plaintiff must plead and prove: (1) a legal duty on the part of the defendant to use ordinary care to protect the plaintiff against unreasonable risks of harm: (2) a breach of that duty; (3) a proximate cause between the breach and the resulting injury; and (4) actual damages to the plaintiff's person or property. <u>Cook v. Smith</u>, 33 S.W.3d 548 (Mo.App.W.D. 2000). Missouri courts have held that the duty to supervise is narrow, requiring "the existence of a relationship between the

15

plaintiff and defendant that the law recognizes as the basis of a duty of care." Cook, 33 S.W.3d at 553.

Plaintiff alleges that, based on an alleged confidential relationship, Hames and the Northwestern defendants had a duty to plaintiff, and were negligent by failing to adequately train, supervise and monitor Lipscomb. (Amended Complaint ¶¶ 52-53). Plaintiff contends that notice of Lipscomb's conduct was evident, an in support thereof, presents a letter dated May 15, 1998, in which Sally E. Austin, an Agency Compliance Specialist, presumably with Northwestern Insurance, cautioned Lipscomb *inter alia* against referring to cash value life insurance as "tax-free." (Plaintiff Ex.: 50; ¶ 5). The letter indicates that Hames was copied in. (Id). A memo authored by Sandy Barton, dated May 24, 1999, indicates concern with, *inter alia*, Lipscomb's use of the term "cash rich" during his seminars (Id.: Ex. 53). By memo dated July 2, 1999, Barton noted his conversation with Lipscomb to tailor his language to discuss death benefits first, and accumulation second in his seminars. (Id). By memo dated July 6, 1999, Barton relayed his feeling that a prior phone conversation, held with Lipscomb on June 2, 1999, resulted positively, with Lipscomb understanding the need to tailor his language to discuss death benefits first, and accumulation second during his seminars; he relayed his thoughts to Hames. (Id.: pg. 3). These memos further indicate that Barton's findings, as well as his recommendations were relayed as updates to other personnel with Northwestern Insurance. Notwithstanding this evidence, however, most of the above noted correspondence, as well as other evidence presented by plaintiff reveal that the alleged notice to Northwestern defendants and Hames, as to Lipscomb's misrepresentations takes place after the sale of the policies now in dispute. For example, plaintiff admits that the seminars conducted by Lipscomb in which he misrepresented facts to other agents occurred during the period of May 18,

16

1999, through October 22, 2001. (Statement of Additional Facts: ¶¶ 141-48). It is undisputed that plaintiff learned of NASD's investigation in early 2003 (Amended Complaint: ¶ 19); and the ultimate findings of the NASD investigation were executed by Northwestern Investment and Lipscomb in late 2004; several years after the alleged misconduct.[16]

In general, apart from the May 15, 1998 memorandum, plaintiff's filings fail to set forth specific facts that would raise a triable issue as to liability of Hames and the Northwestern defendants on this claim.

Recission

In Missouri, a victim of fraud has two options: recission of the transaction, which permits the victim to return any benefits received from and to recover benefits conferred on the perpetrator, or affirmance of the transaction, which permits the victim to recover damages. In Re Usery, 123 F.3d 1089, 1093 (8th Cir. 1997); see also, Evergreen Nat. Corp. V. Carr, 129 S.W.3d 492, 496 (Mo.App.S.D. 2004). A party who affirms the contract and sues for damages must prove "actual fraud," i.e., must prove "the speaker's knowledge of its falsity" as required by the first prong of the fourth element of a fraudulent misrepresentation case. Evergreen, at 496. On the other hand, when, as here, a party opts to disaffirm the contract and sue for rescission, such party can prevail by proving either actual fraud or constructive fraud. Id. Thus, a claim for rescission can be based upon a false misrepresentation or made innocently as a result of a misapprehension or mistake. Id.

---

[16]Whether the May 15, 1998 memorandum evidences negligence regarding the final purchase, and affording an opportunity to plaintiff to avoid his earlier purchases – or evidences appropriate due care in supervising Lipscomb – will be considered further in light of its context. It could also be a significant or critical document showing a right to control the details of sales presentations – unless construed as merely advisory (a right to make suggestions).

17

In actions involving the sale of life insurance policies, it has been held that a person induced to take out a life policy by the fraudulent representations of the agent of the insurer, may rescind the contract of insurance for the fraud on acting promptly after the discovery thereof. <u>Lierheimer v. Minnesota Mut. Life Ins. Co.</u>, 99 S.W. 525 (Mo.App.E.D. 1907).

In his claim for rescission, plaintiff claims that inasmuch as Northwestern Investment was not licensed to do business in the state of Missouri until October 30, 2000, the sales of the policies were illegal. (Amended Complaint: ¶ 44). As a result of defendants' fraudulent conduct, plaintiff seeks rescission of the policies, the return of all monies paid under the contracts, and other consequential damages including the loss of use of monies paid into policies. (Id: ¶ 45).

The Northwestern defendants argue that plaintiff has failed to show the existence of fraud. They further argue that the Adjustable Comp Life policy purchased by plaintiff in 1995, was not a variable policy, and, therefore, is not considered a security; and the statute in effect at the time of plaintiff's purchase of the 1997 and 1999 policies exempted life insurance from the definition of security. Lipscomb concurs with this argument, as does Hames. However, Hames also notes that because the benefits received by plaintiff are incapable of return, rescission is inappropriate.

Notwithstanding the arguments raised by the defendants, as noted above, there is a triable issue of fact as to the alleged misrepresentations; thus, to that extent, plaintiff can justifiably seek rescission. However, a question remains, not addressed by the parties, as to whether plaintiff acted promptly after discovery. In support of other defenses, the defendants have argued that plaintiff should have read the policies at issue, and would have then been aware of their import. While plaintiff has countered that in justifiably reliance on Lipscomb's statements, perusal of the policies was unnecessary, and the complexity of the documents would have, in any event, defeated a reading.

Nevertheless, the question of what constitutes a reasonable time within which to declare a rescission is ordinarily a question of fact. Thus, summary judgment will be denied.

It is therefore ORDERED that the three motions for summary judgment will be denied, without prejudice to trial defenses on particular issues noted herein.

        /s/ Howard F. Sachs
        HOWARD F. SACHS
        UNITED STATES DISTRICT JUDGE

June 13, 2005

Kansas City, Missouri